MARTIN TUCKER *vs.* MYER PEARLSTEIN.

Norfolk.   March 8, 1956. — April 2, 1956.

Present: QUA, C.J., RONAN, WILKINS, COUNIHAN, & WHITTEMORE, JJ.

*Sale,* Warranty, Of pullets.

A finding of breach of a warranty that several hundred pullets sold were "all beautiful healthy birds, all perfect . . . and O.K." was justified by evidence that for an unexplained reason the seller requested the buyer to take delivery after dark and that some of the pullets died beginning within a few hours after delivery and manifested a disease which took one to three days to manifest itself.

CONTRACT.   Writ in the District Court of Western Norfolk dated November 24, 1953.

The action was heard by Grover, J.

*A. T. Handverger*, for the defendant, submitted a brief.

No argument nor brief for the plaintiff.

WHITTEMORE, J.   The plaintiff sued for a balance due on the sale of five hundred live pullets and certain bales of shavings.   The defendant's answer set up a breach of warranty in respect of the pullets.   The District Court judge found that the plaintiff had made materially false representations, namely, that the pullets which the defendant was taking were "all beautiful healthy birds, all perfect, vaccinated, and O.K.," that the defendant "notified the plaintiff of his claim of breach of warranty" with reasonable promptness, and that the defendant owed a balance of $37.90 on the price of the three hundred ninety-five pullets which had survived, having already paid the plaintiff $920. On report, the Appellate Division held that there was prejudicial error in the denial by the trial judge of the plaintiff's requests for rulings that "The evidence introduced by the defendant is insufficient to constitute a defence to this action" and that "There is no evidence of breach of warranty."   This is the defendant's appeal from the order of the Appellate Division of judgment for the plaintiff for $289.90, the balance due for five hundred pullets.

We hold the order of the Appellate Division to be in error.

The relevant evidence taken most favorably for the defendant was as follows:   The plaintiff's henhouse from which the pullets were removed for delivery to the defendant was dimly lighted.   The plaintiff had requested that this delivery be made after dark and the defendant had acceded to this having known the plaintiff for eighteen years.   The pullets were transported by truck and placed in a separate section of the defendant's henhouse which had been unused for a year and disinfected.   Two of the pullets were dead the next morning and the defendant did not know the cause of their death;   six more died within the next three days.   Three days after the delivery, the defendant informed the plaintiff that some of the pullets had died, and the plaintiff then came and examined the pullets and gave them medicine. One hundred five of the five hundred pullets died in all,

but the time of death, except for the first eight to die, did not appear. The plaintiff testified that he knew of a disease called "fowl typhoid" which was a bacterial disease communicated by birds drinking water from a supply which had been contaminated by already infected rats or wild birds drinking from the same container, and that this disease manifested itself in from one to three days by the comb shrinking and the bird moping in a corner; also that no remedy had been found for it. The defendant testified that the combs of the dead birds had shrunk.

The pullets were not "all beautiful healthy birds . . . and O.K." on the morning after their nocturnal delivery. The plaintiff's request to take delivery after dark, otherwise unexplained, could reasonably have been found to relate to what was principally going on, namely, the sale and delivery of birds which had been warranted healthy. It could have been found to be an admission that there was something about the appearance of the birds which the plaintiff did not want the defendant to see. The report states that the defendant testified that "the combs of the dead birds had shrunk." Strictly this describes the combs only when the birds were dead. Nevertheless it is a manifestation of the disease about which the plaintiff testified and which according to his testimony has an incubation time such that, if present in this flock on the morning after the sale, it could have been there at the time of the sale. The circumstances that the birds began dying within a few hours after delivery, that it is a generally known fact that all diseases take some time to incubate, that these birds had a manifestation of a disease which takes from one to three days to manifest itself, and that the plaintiff for an unexplained reason wanted the delivery of the subject birds to take place under cover of darkness are just enough, we think, to let the fact finder conclude that the flock was not beautiful and healthy when sold. The proposition to be proved in the particular case "is proved by a preponderance of the evidence if it is made to appear more likely or probable in the sense that actual belief in its truth, derived from

the evidence, exists in the mind or minds of the tribunal notwithstanding any doubts that may still linger there." *Sargent* v. *Massachusetts Accident Co.* 307 Mass. 246, 250. We think the District Court judge on the evidence here could, within the bounds of reason, have had actual belief in the truth of the defendant's proposition notwithstanding the doubts which the paucity of the evidence must have generated.

> *Order of Appellate Division reversed.*
> *Judgment to be entered on the finding*
> *of the District Court.*